**JANET NAVIGATION INC., Plaintiff,**

**v.**

**Nicholas Collwyn STURGE, Individually and as Representative for Certain Lloyd's Underwriters, British Law Insurance Co. Ltd., Planet Assurance Co. Ltd., Commercial Union Assurance Co. PLC, Indemnity Marine Assurance Co. Ltd., Excess Insurance Co. Ltd., Home Insurance Co., Ocean Marine Insurance Co. Ltd., Insurance Company of North America (UK) Ltd., Prudential Assurance Co. Ltd., Pearl Assurance PLC, Northern Assurance Co., Ltd., Cornhill Insurance PLC, English & American Insurance Co. Ltd., Switzerland General Insurance Co. (LDN) Ltd., Nippon Fire & Marine Insurance Co. Ltd., Andrew Weir Insurance Co. Ltd., Orion Insurance Co. Ltd., Yasuda Fire & Marine Insurance Co. (UK), Skandia U.K. Insurance Co. Ltd., Minister Insurance Co. Ltd., Insurance Corporation of Ireland Ltd., La Reunion Francaise Soc. Anon. Et D'Reass., Liberty Mutual Insurance Company (Massachusetts), Phoenix Assurance PLC, Baltica–Skan Insurance Co. (UK) Ltd., Baloise Insurance Co. Ltd., Marine Insurance Co. Ltd., Bishopsgate Insurance PLC, Norwich Union Fire Insurance Society Ltd., London & Hull Maritime Ins. Co. Ltd., River Thames Ins. Co. Ltd., Sumitomo M & F Ins. Co. (EUR.) Ltd., Assicurazioni Generali Spa., Defendants.**

**No. 86 Civ. 9932 (JEL).**

United States District Court, S.D. New York.

April 17, 1989.

---

**3.** The Court does not reach the merits of the government's arguments not discussed above.

Cardillo & Corbett by Tulio R. Prieto, James B. Rau, New York City, for plaintiff.

Symmers, Fish & Warner by William Warner, New York City, for defendants.

## OPINION

LUMBARD, Circuit Judge: *

Janet Navigation Inc. brings suit against numerous maritime insurance underwriters to recover on a port risks marine insurance policy that was in effect when Janet's cargo ship S.S. Voyager sustained a fire in its starboard boiler on January 18, 1986 while undergoing repairs at Rodermond Industries' shipyard in Brooklyn, New York. The insurers refused to pay Janet's timely claim and rejected Janet's contention that the cost to repair the Voyager exceeded her insured value. Janet seeks damages in the amount of $1,790,868.22, representing the full insured value of the vessel, plus sue and labor expenses, less the net proceeds from its sale for scrap, and seeks punitive damages in the amount of $2 million and attorneys' fees.

The underwriters assert as an affirmative defense that the fire was not an insured event because of Janet's failure to exercise due diligence to prevent a casualty, as required by the insurance contract. Janet failed to exercise due diligence, the underwriters claim in their amended pleadings, when it engaged in "wilful misconduct" that made the casualty inevitable. In the alternative, the underwriters claim that the ship was not a constructive total loss after the fire because the cost of repairing the boiler would not have exceeded the ship's insured value, and that recovery therefore should be limited to $835,000.00, the estimate of their expert witness.

Jurisdiction is predicated on this court's admiralty and maritime jurisdiction, 28 U.S.C. § 1333(1). The parties agree that the court may also look for guidance to the English maritime insurance rules.

The court finds that the fire was within the intended coverage of the insurance con-

* Sitting by designation.

tract and that the insurers have failed both to sustain their burden of proving their affirmative defense of lack of due diligence and to provide an estimate more credible than Janet's. Consequently, the court finds in favor of Janet Navigation and awards damages in the amount of $1,790,-868.18, representing the insured value of the Voyager, plus incidental expenses accrued up until the time of sale, less the net proceeds of the ship's sale.

## I.

The evidence adduced at trial is as follows:

The Voyager, a C–4 type troop transport built by the United States Maritime Commission in the early 1940s, was removed from military service in 1970. At that time, a cargo mid-section was added and the ship was converted to a container cargo vessel.

In 1984, when the vessel was owned by American Coastal Lines' Amco division, the Steamco Corporation performed certain repairs on her. When Amco failed to pay Steamco, Steamco elected to take a mortgage on the Voyager. Subsequently, the ship was sold at auction in Baltimore in December 1984 to satisfy Steamco's lien, and Steamco, the highest bidder at the sale, acquired the ship. Steamco then had the Voyager towed from Baltimore to Norfolk for the winter of 1984–85 and, in April of 1985, to Brooklyn, New York, where reactivation work was to take place.

James Johnson, then president of Steamco, testified that he personally formed Janet Navigation sometime prior to July 1985 for the purpose of turning the vessel over to an operating company, since Steamco did not operate ships. On November 18, 1985, he entered into an Operation and Management Agreement on behalf of Janet with Penn International Marine Agencies, Ltd., a New York corporation that manages ships.

On November 14, 1985, Janet entered into a time charter with Contract Marine Carriers Inc. (CMC) for the hire of the Voyager. Janet covenanted to deliver the ship by December 31, 1985; CMC had the right to cancel the charter in the event of non-delivery by that date.

Preparatory to the hire of the vessel by CMC, the Voyager was placed in the Erie Basin plant of Rodermond Industries in Brooklyn, New York on November 26, 1985, for reactivation from "laid up" status. Janet procured insurance against casualties to her hull and machinery while she was undergoing reactivation. Two insurance policies provided this coverage. One, subscribed to on behalf of several Lloyd's of London syndicates, with Nicholas Collwyn Sturge as their representative, covered 45.38 percent of the risk; the other, subscribed to by the other defendant underwriters, covered the remaining 54.62 percent of the risk. The combined coverage was $2 million.

The insurance policies (identical in all relevant respects) include fire and boiler casualties among the insured risks:

> Touching the Adventures and Perils which we, the Underwriters, are contented to bear and take upon us, they are of the Seas, Harbors, Inland Waters, Men–of–War, Fire, Lightning, ... and of all other like Perils, Losses and Misfortunes that have or shall have come to the Hurt, Detriment or Damage of the [insured] vessel. . . .
>
> > This insurance also specifically to cover loss of or damage to the subject matter insured directly caused by the following:—
> >
> > .        .        .        .        .
> >
> > Explosions on shipboard or elsewhere; Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers . . .;
> > Negligence of Master, Mariners, Engineers or Pilots;
>
> provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them. . . .

Similar language is repeated in an addendum to the policies entitled "Institute Time Clauses—Hulls—Port Risks."

The insurance contracts also provide for the payment of the insured value of the vessel in the event that a casualty causes the vessel to be a "constructive total loss":

In ascertaining whether the Vessel is a constructive total loss the insured value shall be taken as the repaired value and nothing on respect of the damaged or breakup value of the Vessel or wreck shall be taken into account.

No claim for constructive total loss based upon the cost of recovery and/or repair of the Vessel shall be recoverable hereunder unless such cost would exceed the insured value.

The claim procedure outlined in the policies provides that notice of any casualty allegedly covered is to be tendered upon the underwriters prior to survey of the vessels to permit the underwriters to appoint a surveyor. The policies permit the recovery of certain "sue, labour, and travel" expenses the insured incurs in satisfying its claim against the underwriters. The policies were in effect at the time of the casualty sustained to the starboard boiler.

All reactivation work was to be performed, under the policies, in accordance with the requirements of certain agencies engaged in the regulation of the shipping industry. These agencies—the United States Coast Guard, the American Bureau of Shipping (ABS) and the London Salvage Association (Salvage) are involved in nearly every step of preparations for navigation and activities at sea. Their reports relating to certification of the vessel as seaworthy, surveys of damages sustained in accidents and assessments of the costs of repair are generally respected in the industry. Those of their reports that were admitted into evidence, in addition to an extensive survey and report by Marserv, Inc., a marine surveying and engineering company, serve as the principal documentary evidence. The Voyager was powered by two Babcock & Wilcox (B & W) single-pass marine boilers, one on each side of the vessel. Boilers of this make and model are known as "sinuous" or "sectional header" boilers and are fitted with oil burners, interdeck superheaters, horizontal tubular gas air heaters and water-cooled furnace side and rear walls. The sectional headers consist of "downtake headers", which supply water to the boiler's heating tubes, and "uptake headers", which carry the water and steam away from the tubes. The term "sinuous" refers to an assembly process whereby groups of tubes within the boiler are staggered with respect to each other. The Voyager's boilers were the original B & W steam plants installed in 1945.

Much of the dispute concerns whether the headers which were damaged in the incident could have been repaired or replaced by B & W or another manufacturer and whether a replacement boiler for the starboard boiler was available in 1986. B & W reported that it no longer manufactures the sectional headers for these boilers; the forms and dies for the sinuous headers have "long since been scrapped." The parties are in agreement that it would not have been prudent to replace the starboard boiler with a unit incompatible with the port boiler because of inherent steam balance and control problems.

The casualty to the starboard boiler occurred on January 18, 1986. Prior to that date, it was being fired for domestic heating purposes and as part of the testing of the port boiler until that boiler was damaged by overheating on December 20, 1985. On December 10, 1985, the Coast Guard agreed to permit the starboard boiler to be fired for shipboard services and heating and then to be shut down for inspection after the port boiler and the steam plant were operative and approved. This pre-inspection firing was necessary, in the opinion of the Coast Guard and the ship's Chief Engineer Lincoln McRae, because of extremely cold weather and the shipyard's inability to provide the vessel with an alternative source of steam for heating purposes and in order to heat the heavy oil in the ships' tanks prior to firing the boilers. To that end, the starboard boiler was "air lanced" and wire brushed where access allowed, and it was fired for the first time,

using light diesel fuel,[1] on December 14. The next few days were spent repairing small steam leaks in the starboard boiler with the pressure maintained at about 200 pounds per square inch (p.s.i.), and then, on December 17, it was fired to apply a pressure of 450 p.s.i. to the port boiler as part of that boiler's hydrostatic test.[2] That test was successful and the Coast Guard passed the port boiler. The port boiler was then drained due to cold weather; the starboard boiler was fired daily for about six to twelve hours for heating purposes.

On December 19, the port boiler was refilled with water and then "lit off", or fired, on December 20, using diesel oil. When the indicators showed that the boiler was empty of water and that it had overheated by 150 degrees, the boiler was shut down and cooled. It was not fired again; the starboard boiler continued to be fired on a daily basis during surveys and repairs of the port boiler.

Robert Taylor, the owner of Transworld Boiler Company, a boiler repair company, was immediately called to evaluate and repair the port boiler. He and his crew tested the boiler, found that it was leaking, and commenced to re-roll the tubes in the boiler by inserting a tool into the tubes to expand the joints to make them watertight under pressure. When this failed, they cropped out a part of the side of the boiler and, pursuant to the advice of Salvage, spent about a week visually inspecting the tubes, after which Taylor recommended that the boiler be re-tubed. Taylor continued work on the port boiler until about January 25, 1986, about one week after the starboard boiler fire.

In the meantime, about December 27, apparently due to the delay that would be caused by the repairs to the port boiler, Janet paid off and discharged several crewmen from the Voyager. Up to that date, 11 men had been on the vessel's payroll, exclusive of contractors' workmen who were doing the reactivation work. After December 27, only four crew members remained: Chief Engineer McRae, who was aboard the vessel intermittently during January and February; First Assistant Crosbie, who was aboard on all relevant dates; and two other crewmen who left the ship on January 28.

The cancellation clause in the time charter to CMC matured on December 31, 1985. On January 6, 1986, CMC advised Janet by telex that it was refusing Janet's request to delay the date of delivery; the charter was therefore cancelled as of December 31, 1985. Philip Corletta, an assistant to the vice president of Penn International from November 1985 through the spring of 1986, testified that he attempted to find alternative employment for the Voyager after CMC cancelled the charter, but was unsuccessful and ceased his efforts late in February 1986 when it appeared that the boiler repairs would take a long time.

Reactivation work continued throughout the surveys of the port boiler until, after Janet had received notice on January 6, 1986 that the charter had been cancelled, the work slowed and finally stopped on January 8. During that time and thereafter, the starboard boiler was fired each day (with the exception of Christmas) for heat, apparently at a low pressure.

On January 13, 1986, the watch engineer (presumably Chief Engineer McRae, the only engineer reported aboard the vessel at the time) reported a soot fire in the starboard boiler. The boiler was examined, its doors were opened, and the watch engineer reported everything in order. The crew took no further steps regarding this incident.

1. Diesel oil is lighter than the grade of oil normally used in ships' boilers. As such, it burns more cleanly and leaves smaller deposits inside the boiler that can lead to fouling and fire. Testimony at trial indicated that the boilers were fired on diesel oil during the reactivation procedures for testing purposes and in order to produce steam to meet the cold-weather requirements of the laid-up Voyager—heat, hot water and protection from frost of the various pipes.

2. Robert Taylor, the owner and operator of Transworld Boiler Company, testified that a hydrostatic test involves using water to fill a boiler to ensure the absence of air and then applying pressure to ascertain whether any joints are leaking.

Then, on January 14, the boiler was re-fired in order to proceed with its inspection. Chief Engineer McRae observed that two sidewall tubes were leaking, so the boiler was drained and Taylor was summoned to investigate. He arrived on January 15 and discovered a hole in one side water wall tube at the bottom of the boiler and one other tube that required re-rolling. Taylor and his workers plugged the leaking tube and re-rolled the other tube, hydrostatically tested the boiler and found it watertight.

The boiler was fired again on January 16 and 17 using diesel fuel. It was found tight, and the crew commenced heating the heavy oil in the ship's tanks with steam hoses connected to the starboard boiler. Then, at 7 a.m. on Saturday, January 18, McRae determined that the heavy oil was sufficiently warm to begin burning it. At 8 a.m., he observed that the heavy oil was burning poorly due to water mixed in the fuel; he mixed in diesel fuel to aid the combustion. At 3:30 or 4:00, a pool of hot water was noticed on the floor at the rear of the boiler, indicating another tube leak. McRae had the boiler shut down and called Taylor, who was at his home in Pennsylvania at the time.

Taylor testified that he arrived on board the Voyager about 10:00 that evening, met First Assistant Richard Crosbie in the Chief Engineer's station and went down to look at the boiler, suspecting that the tube he had previously repaired was leaking again. When he got to the steam drum level, he smelled paint fumes and noticed blistering and bubbling paint at the inboard side of the casing on the external surface of the boiler. There was some smoke, but he observed no flames outside the boiler. He placed his hand close to the boiler and felt extreme heat radiating from the boiler.

Observing that the boiler was not running, he suspected a fire and brought Crosbie to the boiler room. The two men removed an inspection door, felt heat pour out at them and looked inside. They observed that the inside of the boiler was "like a glowing mass" and then set about putting out the fire, opening another inspection door and the main access point and

shooting water from a fire hose into the boiler until they were certain that the fire was out. Taylor testified that, when he looked into the main access point, he saw soot smoldering and sparking in the area of the header side of the boiler and in the drums. The two men hosed the boiler until they could see no more evidence of fire.

The next day, Taylor and his men removed the fire side doors, cropped out the casing on the outboard side of the boiler and looked at the tubes and the rest of the boiler. This work continued for about one week, during which time they found that the tubes were badly distorted and that the steam drum and headers displayed signs of exposure to extreme heat.

Meanwhile, Janet had informed the insurers that the starboard boiler had sustained a casualty due to a soot fire on January 18, 1986. The underwriters responded by instructing Salvage, whose business is to survey marine businesses and ships, to visit the Voyager, survey the damage, ascertain the cause, if possible, and prepare an estimate of the cost of repairs. Johan P. van Grieken, representing Salvage, visited the vessel on January 25, 1986 and on subsequent dates. He took oral statements from the crew members about the circumstances surrounding the fire and surveyed the boiler, and, on April 15, 1986, circulated a written report.

In his preliminary survey, van Grieken, an eighteen year employee of Salvage with considerable experience in maritime engineering, found that the boiler's generating tubes were distorted, discolored and partly melted, that the front headers and steam drum evidenced exposure to extreme heat and were possibly deformed, and that parts of the side casing were displaced. He preliminarily recommended that tests be performed on the drum and headers and that a further survey be conducted thereafter.

Accordingly, the drum and headers were "hardness tested" by a metallurgist. This so-called "non-destructive testing" (NDT) was conducted by the Non–Destructive Testing Corporation, which reported on March 11, 1986 that the hardness of the headers varied considerably from point to

point, most likely due to uncontrolled heating. The report concluded that, although the metal was strong, its uneven surface made it highly susceptible to corrosion or rupture when under stress.

A representative of B & W then examined the boiler and the NDT results and wrote a letter to Penn International recommending that the drum and headers be removed and shipped to B & W's facility in Paris, Texas to determine whether they could be repaired. The letter noted that, in the event that the components were irreparable, replacement would be impossible because no new headers were available and the necessary manufacturing equipment is no longer available.

Van Grieken, on the basis of the B & W report, recommended procedures to extract the drum and headers for repair by B & W and to re-tube and finish the boiler.

Regarding the cause of the casualty, van Grieken wrote in his April 15 report that, in

his opinion, "the damage sustained could possibly be reasonably considered attributable to the alleged cause" of crew negligence. He noted that soot, caused by daily firings for about five weeks, had accumulated inside the boiler. He also noted, however, that a local regulation prohibited the relief of such a condition by "blowing out the tubes", or causing the discharge of the particles through the exhaust system. Therefore, he concluded, the crew "cannot really be held responsible or termed negligent" for having failed to blow out the tubes. His report did not, however, address the conduct of the crew after the soot fire on January 13.

On March 10, 1986, Janet, through the brokers Clarkson Puckle Marine Holdings, Ltd., tendered to the underwriters a notice of abandonment of the vessel and advised them that the estimated cost of repairs, $2,250,600,[3] exceeded the insured value of $2 million. The underwriters rejected the notice of abandonment on that same day.

---

**3.** Janet's estimate of the cost to repair the starboird boiler was broke down as follows:

1. January 22, 1986 to February 13, 1986
   - A. Transworld Boiler Co. — $ 25,000.00
   - B. B & W service engineer — 3,000.00
   - C. Services — 27,600.00
   - D. Crew cost — 23,000.00

2. February 14, 1986 to July 17, 1986
   - A. Transworld Boiler Co. (boiler only) — 140,000.00
   - B. Removals and replacements (no boiler) — 375,000.00
   - C. Transportation to Texas from N.Y. — 15,000.00
   - D. At B & W Paris, Texas plant
     1. Header inspection — 32,000.00
     2. Steam drum inspection — 2,000.00
     3. Repair of headers — 160,000.00
     4. Repair of steam drum and testing, USCG/ABS certified — 75,000.00
   - E. Transportation of boiler components from Texas to New York — 15,000.00
   - F. Rigging of steam drum and headers into vessel; installation of same, including tubes and testing — 230,000.00
   - G. Cost of tubes — 82,000.00
   - H. Refractory work — 48,000.00
   - I. Crane Services — 65,000.00
   - J. Manufacturer's representative — 68,000.00
   - K. Port engineer — 65,000.00
   - L. Services — 624,000.00
   - M. ABS fees — 25,000.00
   - N. Agency fee for vessel management $250 × 544 days (one-half of $500 per day management fee) — 136,000.00
   - O. Ritchie & Cummins Corp. Owner's consultant — 15,000.00

   $2,250,600.00

On March 14, Janet, again through Clarkson, submitted a claim to the underwriters for $2 million, the full amount of the coverage. Salvage reviewed Janet's estimate and determined that the quotations were fair and reasonable, suggesting revisions of several items for a savings of about $90,000.[4]

On April 4, 1986, Clarkson reported to John P. Tilden Ltd., the average adjuster processing the claim, that the underwriters had reviewed Janet's claim and Salvage's report. The underwriters required clarification of Janet's attribution of the cause in light of Salvage's determination that the crew's failure to blow the tubes was not negligent due to the local prohibition of that procedure and stated that they would not consider the Voyager a constructive total loss on the figures provided. They also requested clarification of certain items in the estimate and suggested lower amounts on two items.[5]

Janet's agent, Penn International, responding by letter to Tilden on May 5, 1986, stated that Janet's position was that the crew was negligent, not in failing to blow the tubes in violation of the local regulation, but by continuing to fire the boiler after the indication of fouling on January 13, of which Janet had not been informed. Janet also insisted that the expenses already incurred, then estimated at $78,600, must be included in the compilation of the overall cost of repairs, agreed to the two suggested amount reductions and clarified the entries complained of by the underwriters.[6] Penn concluded that the revised constructive total loss claim was $2,167,360.

On May 9, 1989, Tilden wrote to van Grieken at Salvage requesting his opinion concerning the cause of the fire and the reasonableness of Janet's quotations. Van Grieken responded on May 14, 1986, stating that "we consider it reasonable to state that crew were negligent in continuing to fire the boiler after the previous soot fire experienced on January 13, 1986." Van Grieken also approved the daily services expense and the quotation Janet had received for scrapping the vessel of $40 per ton, a total of $322,240.

The underwriters then asked Salvage to determine, independently of Janet, whether a used boiler could be procured, the cost of such a boiler and the cost of modifying the ship to be compatible with an alternative design of boiler. Salvage then retained Marserv to report on the boiler replacement project. Marserv, reporting on September 9, set forth specifications for replacement of the starboard boiler and estimated the cost at $1,580,108, figuring $588,800 for a replacement boiler and assuming that a used boiler could be procured. However, Joseph Winer, the underwriters' expert witness, conceded at trial that Marserv could not locate a suitable used boiler.

In October 1986, after notifying the underwriters, Janet sold the Voyager to a Taiwanese company for scrapping for $460,314.90, less brokerage fees of $14,960.24. The vessel left under tow on October 8, 1986.

Janet brought this action on December 30, 1986, demanding payment of the claim from the individual underwriters according to their respective proportions of the policies, less the net proceeds of the sale of the

---

4. Salvage expressed no opinion on the quotations for the services of the port engineer and agency and classification fees and computed the daily service expense on a daily rather than an aggregate basis. Salvage found that $1200 was a fair and reasonable amount for these daily services; Janet's initial estimate of $624,000 would have covered 520 days on that basis. Testimony at trial indicated that the job would have taken at least that long to complete, inclusive of a several-week hiatus in the boiler work while asbestos was removed from the vessel.

5. The underwriters suggested $310,000 for Item 2(B) and $50,000 for Item I, see note 3 supra.

6. Penn International broke down the daily service costs (item L in note 3 supra) as follows:

| | |
|---|---|
| Watchman | $ 575.00 |
| Berth Hire | 335.00 |
| Electricity and Water | 245.00 |
| Sanitary Services | 10.00 |
| Telephone | 15.00 |
| Miscellaneous | 20.00 |

Penn also provided supporting documentation for several other elements in the estimate.

Voyager, plus approximately $200,000 in sue and labor expenses. Janet also sought $2 million in punitive damages.

The underwriters' answer denied Janet's allegations and asserted four defenses: (1) that Janet fails to state a claim upon which relief can be granted; (2) that Janet refused the underwriters' requests for the production of log books, bell books, crew payrolls, formal and informal reports of the accident, communications with the classification societies, communications with government agencies, and documents relating to the repairs already carried out, thereby waiving their claims under the policies;[7] (3) that the loss was the result of "want of due diligence" on Janet's part and is therefore not covered by the policies; and (4) that the Voyager was not a constructive total loss because the cost of repair did not exceed her insured value of $2 million.

During trial, on November 22, the court granted the motion of the underwriters under Fed.R.Civ.P. 15(b) to amend their answer to add to their defense of lack of due diligence the claim that the casualty was not a fortuity, but instead had come about inevitably as a result of "wilful misconduct" on Janet's part.

Janet presented evidence that the cost to repair the boiler would have been $2,330,-088.07,[8] an amount in excess of the insured value of $2 million.

The underwriters presented evidence to show that the casualty was not covered by the policies and that, even if it were, the cost to repair the Voyager would have been only $835,000. Their principal witness, Joseph Winer, was qualified as an expert in

7. The underwriters did not press this claim at trial and in their briefs and appear to have abandned it. In any event, there is no showing that Janet failed to produce any documents relevant to the issues in this case, especially in view of the mass of documents before the court.

8. Janet's revised estimate provides as follows (the court calculates the total of these figures to be $2,321,988.07, $8,100 less than Janet indicates):

| | | | |
|---|---|---|---|
| 1. | January 22, 1986 to February 13, 1986 | | |
| | A. | Transworld Boiler Co. | $ 25,000.00 |
| | B. | B & W service engineer | 1,950.22 |
| | C. | Services | 27,600.00 |
| | D. | Crew cost | 15,934.85 |
| 2. | February 14, 1986 to July 17, 1986 | | |
| | A. | Transworld Boiler Co. (boiler only) | 140,000.00 |
| | B. | Removals and replacements (no boiler) | 310,000.00 |
| | C. | Transportation to Texas from N.Y. | 10,000.00 |
| | D. | At B & W Paris, Texas plant | |
| | | 1. Header inspection | 32,000.00 |
| | | 2. Steam drum inspection | 2,000.00 |
| | | 3. Repair of headers | 160,000.00 |
| | | 4. Repair of steam drum and testing, USCG/ABS certified | 71,750.00 |
| | E. | Transportation of boiler components from Texas to New York | 10,000.00 |
| | F. | Rigging of steam drum and headers into vessel; installation of same, including tubes and testing | 230,000.00 |
| | G. | Cost of tubes | 82,000.00 |
| | H. | Refractory work | 48,000.00 |
| | I. | Crane Services | 50,000.00 |
| | J. | Manufacturer's representative | 56,000.00 |
| | K. | Port engineer | 65,000.00 |
| | L. | Services ($1,200 × 535 days) | 642,000.00 |
| | M. | ABS fees | 15,000.00 |
| | N. | Agency fee for vessel management $250 × 560 days (one-half of $500 per day management fee) | 140,000.00 |
| | O. | Asbestos removal | 187,753.00 |

$2,330,088.07

marine surveying and engineering, and testified that, in his opinion, the fire in the starboard boiler "was the inevitable result of extended, long-term gross negligence and management on the part of the owner." He based this upon his conclusions that the boiler was fired when insufficient crew were aboard to monitor it and that the history of the ship's care showed past culpable conduct.[9] He also testified that the starboard boiler might have been fired to produce steam from impure water rather than pure distilled water during the winter the ship spent in Baltimore, which would have had the predictable result of incomplete combustion and fouling of the boiler.

Winer also estimated that the cost of repairing the starboard boiler would have been only $835,000, rather than over $2 million as Janet had claimed. He based his figures on his assertion that two used D-type boilers could be purchased and installed to replace both of the Voyager's boilers, since replacing only one would have been inadvisable. The estimate included the price of two boilers, their transportation to the Voyager, access to the boiler room for their installation, the actual installation, refitting the ship's steam plant and various shipyard service and classification expenses.

On cross-examination, Winer referred to his conclusion as a "lump sum estimate" and stated that he was unable to prepare an estimate based on hourly rates and material costs in the manner that Marserv had as part of its $15,000 project. Apparently, Winer's estimate was based primarily on his own experience, rather than actual inquiries, because it was prepared close to the time of trial and was based exclusively on documentary evidence. Winer himself never visited the Voyager.

## II.

The two issues are whether Janet failed to exercise "due diligence" as required by the terms of the contract and whether the cost to repair the boiler would have exceeded the ship's insured value. As the court finds that the casualty sustained by the starboard boiler was caused by the crew's negligent conduct after the January 13 soot fire, and as the underwriters have failed to show any lack of due diligence on Janet's part, the underwriters are liable under the insurance policies. The court also finds that Janet was entitled to treat the vessel as a constructive total loss under the policies because the evidence shows that the repairs would have cost in excess of $2 million. The court credits Janet's estimate of the cost of repairs primarily because the evidence demonstrates that no replacement boiler was obtainable and the repairs therefore would have involved the costly and time-consuming step of shipping the damaged boiler components to B & W for re-tooling.

■ The fire in the starboard boiler was a peril covered by the insurance contracts. The policies by their terms were payable in the event of a fire in a boiler, subject only to the requirement that the owners exercise "due diligence" in their management and operation of the vessel. The contracts were expressly written to insure against risks while in port, and the parties most certainly intended that the risks associated with the reactivation of a ship that had not sailed in some months were to be covered. The burden is on the underwriters to prove that this fire, sustained during the repair and testing of the steam plant, falls outside the scope of the insurance contracts. They have failed to sustain that burden.

■ The underwriters argue first that the Voyager was not "seaworthy" when the fire occurred. To the extent that the question of "seaworthiness" does not involve negligence on the part of the owner, the defense is without merit. Janet must have arranged for the reactivation because it thought that the vessel, having been laid

**9.** The underwriters elicited testimony to prove that the Voyager was owned by the same men, including James Johnson, despite the various corporate names, and that these men had engaged in a long course of neglect with regard to the ship. The court finds that such evidence, stated only in general terms, does not touch upon whether the owner had knowledge of the negligence of the crew which led to the casualty.

up for many months, might be unseaworthy. The underwriters knew that the insurance was to cover the period of time during which the reactivation was to take place. The underwriters' reliance on cases in which unseaworthiness precluded recovery is therefore misplaced. The underwriters knew that they were writing policies to cover repair work performed on a decrepit vessel and the claim that the Voyager was unfit for service on January 18, 1986 is immaterial. This being so, it is absurd to claim as a defense that the vessel was unseaworthy, as the taking out of the insurance would then have been an idle, costly gesture with no protection for Janet.

Of greater relevance is the underwriters' argument that recovery is precluded due to Janet's failure to exercise due diligence in its management of the ship. Although the evidence shows that the ship had a somewhat rough journey through the hands of different owners, the court finds that the underwriters have not shown either wilful misconduct or sufficiently negligent conduct on Janet's part to trigger the policies' exclusion clauses.

The court finds that the negligence of the crew was the proximate cause of the fire in the starboard boiler on January 18, 1986. The evidence shows that the fire was caused by the crew's failure to take appropriate action after that boiler sustained a soot fire five days earlier. The boiler should have been shut down after that incident until a thorough inspection and cleaning had been performed. The crew instead fired the boiler the very next day and on each day thereafter until January 18th, when the second fire occurred.

■ There is no reason to charge Janet with knowledge of or negligence for not having been aware of the first casualty. "[O]nce it is shown that the loss has been caused by fire, ... the onus is upon the defendant to show on a balance of probabilities that the fire was caused or connived at by the plaintiff." *Slattery v. Mance,* [1962] 1 Lloyd's Rep. 60, 62 (Q.B.). There is no evidence, however, that Janet or Penn International had any reason to doubt that the reactivation was proceeding without in-

cident. The underwriters have also failed to provide any evidence to show that, during this stage of the reactivation process, Penn International and Janet were remiss in their duties to keep themselves informed of the progress of the work on board and the condition of the vessel. Neither Janet nor Penn International acted in bad faith or negligently by failing to become aware of the crew's negligent conduct during the few days on which the boiler was fired after the first soot fire. The underwriters have therefore not demonstrated that the loss resulted from any bad faith or lack of due diligence on the part of the assured or its agents. *Union Insurance Co. v. Smith,* 124 U.S. 405, 427, 8 S.Ct. 534, 546, 31 L.Ed. 497 (1888), *quoted in L & L Marine Service, Inc. v. The Insurance Co. of North America,* 796 F.2d 1032, 1035–36 (8th Cir.1986); *see also New York & Porto Rico Steamship Co. v. Aetna Insurance Co.,* 204 F. 255, 258 (2d Cir.1913).

■ The underwriters further argue that Janet had permitted the starboard boiler to be fired with a frequency and in a manner not approved by the regulatory and classification authorities, thus triggering the exclusion in the policies for non-compliance with those directions. Specifically, Winer testified that the circumstantial evidence convinced him that the boiler had been used to boil impure water and that the starboard boiler was fired daily after the port boiler casualty on December 20, 1985, in contravention of the Coast Guard's permission. However, there was no evidence to support his opinion that sufficient diesel fuel was consumed when the ship was docked in Baltimore to produce more steam than there was pure distilled water available from which to create that steam. As for the frequency of use of the starboard boiler, the Coast Guard had approved the firing of that boiler until the port boiler was tested and operating. The court is not persuaded by Winer's opinion that this implied that the starboard boiler should not have been fired after the port boiler casualty on December 20.

■ Nor does the court find any reason to conclude that too few men were aboard

when the fire occurred. The underwriters introduced no evidence to show how many crew members ought to have been aboard. Nothing in the record suggests that the complement of three crewmen on January 18 was inadequate for an inactive ship undergoing repairs.

In sum, there is no evidence of any misconduct or any sufficiently negligent conduct on Janet's part to contradict van Grieken's conclusion that the casualty was attributable to crew negligence. It is precisely this sort of event—the destruction of the owner's property caused by negligent handling of it by the owner's employees—for which an insurance policy is written. The court therefore concludes that the fire was an insured event for which Janet is entitled to recover.

The remaining issue is whether the Voyager was a constructive total loss under the terms of the policy. The evidence indicates that no replacement boiler was available when Janet made its claim and that the repair project, including the repair by B & W of the damaged boiler components, would have taken approximately as long as Janet surmised. Consequently, the court finds Janet's estimate to be reasonable and credible and therefore finds that the Voyager was a constructive total loss.

Janet estimates that it would have taken 535 days and would have cost $2,330,088.07 to have repaired the Voyager. This assumes that the components of the damaged boiler would have been removed and shipped to B & W's facility in Paris, Texas for repair. The costs of this must be part of the total cost of the project, as there was no showing that it would have been possible to find a suitable boiler. Marserv estimated a cost of $1,580,108 and only 77 days to complete the job, assuming that a suitable replacement boiler could be located.[10] Winer estimated that the total cost would have been only $835,000 and that it was "not a monumental job." His estimate assumed the availability of two boilers to replace both of the Voyager's boilers.

Both Janet and Salvage investigated the question of whether the boiler could be replaced. Salvage, at the request of the underwriters, asked Marserv to attempt to locate a suitable replacement boiler, but, as Winer conceded on cross-examination, Marserv was unable to locate one. In preparing its estimate, Marserv nevertheless assumed the availability of a suitable boiler, simply quoting a preliminary B & W price of $1 million for two boilers, halving that figure and adding fifteen percent to arrive at the figure for one boiler. The court is not persuaded by Marserv's assumption that one compatible boiler could be purchased; the evidence is to the contrary.

Likewise, Winer, in forming his opinion, based his arithmetic on his assumption that two D–type boilers, which he had purportedly located at an undisclosed location in a Great Lakes port, could be fitted into the Voyager. He testified that he, unlike Marserv, was able to find these replacements—and would have been able to find replacement sinuous header boilers—because he knew "where to go to get things." However, no evidence was introduced to show that two suitable boilers could have been procured in 1986.

More convincing are the quotations of B & W which were prepared as part of Marserv's investigation. These figures were arrived at with the assumption that the only alternatives were either to retool the existing boilers, in a manner similar to that envisioned by Janet, or to replace the entire steam generating system. As the court has found suitable replacements to have been unavailable in 1986, Janet would have had to remove the damaged headers and drum and ship them to B & W for repair.

The evidence shows that the repair of the boilers by B & W and their installation in the Voyager would have taken at least five hundred days, approximately as long as Janet estimates. Rudolph Schoen III, an employee of B & W who assisted in the preparation of B & W's quotations, testified that the inspection and repair of those

---

**10.** It is unclear whether Marserv's estimate of 77 days included the full time required for access and removals, installation and testing of the boiler, or only the installation segment of the job.

components would have taken about twelve months, exclusive of transportation time. Taylor of Transworld Boiler estimated that accessing and removing the damaged parts would have taken about nine weeks, with a similar period required for their reinstallation. These three steps in the repair and installation of the boiler add up to about five hundred days, quite close to Janet's estimated project time of 535 days. The court therefore finds that Janet's $642,000 figure for the daily services required during the pendency of the project, based on 535 days at $1200 per day, to be reasonable. Even were the project to have taken just five hundred days, the total cost would have exceeded $2 million. Consequently, the court finds Janet's adjusted estimate of $2,321,988.07,[11] which provides for the repair of each component of the boiler, to be the more credible figure. Janet is therefore entitled to recover the full amount of the insurance policy of $2 million, plus sue and labor expenses of $236,222.84,[12] as provided for in the policies, less the proceeds of the sale of the Voyager for scrap of $460,314.90, plus Janet's brokerage expenses of $14,960.24, which the court calculates amounts to $1,790,868.18.

Finally, the court finds no basis to grant Janet's claim for punitive damages.

Judgment will be entered for plaintiff in the amount of $1,790,868.18, plus prejudgment interest from the date of Janet's claim, March 14, 1986.

This opinion constitutes the findings of fact and conclusions of law, Fed.R.Civ.P. 52.

---

**11.** The court finds that Janet's revised estimate, *see* note 8, *supra*, contains an $8,100 arithmetic error and has adjusted its award accordingly.

**12.** These expenses, incurred to maintain the vessel during the period between Janet's delivery to the underwriters of its notice of abandonment and the delivery of the vessel to the buyer, consisted of wharfage fees, watchman services, insurance premiums, electricity, water and other miscellaneous services. The underwriters do not dispute these amounts.